UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ROBERT J. VOCCOLA          :
                               :
       v.                 :      C.A. No. 06-180A
                               :
JO ANNE B. BARNHART,      :
Commissioner of the Social Security   :
Administration              :

**MEMORANDUM AND ORDER**

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. § 405(g). Plaintiff filed his Complaint on April 20, 2006 seeking to reverse the decision of the Commissioner or, in the alternative, to remand for further proceedings. On November 22, 2006, Plaintiff filed a Motion for Summary Judgment. On December 22, 2006, the Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner.

With the consent of the parties, this case has been referred to me for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Based upon my review of the record and the legal memoranda filed by the parties, I find that there is substantial evidence in the record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I order that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 8) be GRANTED and that Plaintiff's Motion for Summary Judgment (Document No. 7) be DENIED.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on February 19, 2003, alleging disability as of December 17, 2001.[1]  (Tr. 71-73).  The application was denied initially (Tr. 29, 32-34) and on reconsideration.  (Tr. 30, 36-38).  Plaintiff filed a request for an administrative hearing.  On January 31, 2005, an initial hearing was held before Administrative Law Judge Martha H. Bower (the "ALJ").  However, this hearing was continued to March 21, 2005 because the vocational expert assigned to this case was not available.  (Tr. 314-317).  A subsequent hearing was held on March 21, 2005.  Because Plaintiff was not present, this hearing was also continued.  (Tr. 318-321).  A hearing was then held on July 22, 2005 at which Plaintiff, represented by counsel, a vocational expert and a medical expert appeared and testified.  (Tr. 322-359).

On August 20, 2005, the ALJ issued a decision finding that Plaintiff was not disabled.  (Tr. 13-19).  Plaintiff appealed to the Appeals Council by filing a request for review.  The Appeals Council denied Plaintiff's request for review on February 24, 2006.  (Tr. 5-7).  A timely appeal was then filed with this Court.

## II.    THE PARTIES' POSITIONS

Plaintiff argues that the ALJ erred in finding that his depression was not a medically determinable impairment and in failing to apply the mandatory technique set forth in 20 C.F.R. § 404.1520a.  Plaintiff further argues that the ALJ failed to follow proper standards for pain evaluation pursuant to SSR 96-7p.  Plaintiff also argues that the ALJ failed to give proper weight to the opinion of the treating physicians in violation of SSR 96-2p.

---

[1]  Plaintiff was insured for disability benefits only through December 31, 2003.

The Commissioner disputes Plaintiff's claims and argues that there is substantial evidence in the record that supports the ALJ's residual functional capacity ("RFC") assessment that he was not disabled within the meaning of the Act because he retained the RFC to perform jobs existing in significant numbers in the national economy.

### III.    THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Remand is unnecessary where

all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  Seavey, 276 F.3d at 8.  To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence four remand may be appropriate to allow her to explain the basis for her decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Jackson v. Chater, 99 F.3d 1086, 1090-92 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. With a sentence six remand, the parties must return to the court after remand to file modified findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

## IV.    DISABILITY DETERMINATION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A.    Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical

and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20

C.F.R. § 404.1527(e).  See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

### B.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.    Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained.  See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  Id.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

### D.    The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her RFC, age, education and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).  Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act.  Seavey, 276 F.3d at 5.  The claimant must prove disability on or before the

last day of her insured status for the purposes of disability benefits.  Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(I)(3), 423(a), (c).  If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability.  Id.

### E.  Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  Seavey, 276 F.3d at 5.  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty, 947 F.2d at 996.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant

can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1.    Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> (4) Treatment, other than medication, for relief of pain;
>
> (5) Functional restrictions; and

-10-

(6) The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### 2.    Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

### V.    APPLICATION AND ANALYSIS

Plaintiff was fifty-one years old at the time of the ALJ hearing. (Tr. 14, 71). Plaintiff attended college and needs to complete two courses in order to obtain a bachelor's degree. (Tr. 14, 301, 325). Plaintiff's past relevant work is as a self-employed auto body shop owner/operator. (Tr. 14, 325). Plaintiff initially alleged disability due to back and cardiac problems (Tr. 85-94) and later

expanded his claim, after engaging counsel, to also allege disabling depression.  (Tr. 31, 98-101, 194-204, 325-326).

On December 18, 2001, Plaintiff was involved in a motor vehicle accident and was treated at Cranston Medical with complaints of pain in his lower back to his legs, pain in his neck and numbness in his hands.  (Tr. 118).  Plaintiff was diagnosed with acute cervical strain, cervical degenerative disc disease, lumbosacral strain and parathesias in his hands.  Id.  X-rays taken of Plaintiff's cervical spine showed degenerative disc disease.  Id.

On December 31, 2001, Plaintiff was again treated at Cranston Medical for continuing back pain. (Tr. 117).  Cranston Medical notes indicate that Plaintiff's hand numbness was much improved but that his back and neck pain continued.  Id.

On January 13, 2002, Dr. Rogoff examined Plaintiff who complained of continuing pain in his neck and back that radiated down his left leg.  (Tr. 126).  Dr. Rogoff reviewed MRI results conducted in September, 2001 which indicated that Plaintiff experienced moderate spinal canal stenosis at L2-3 with disc bulging and facet and ligamentous hypertrophy, disc protrusion and extrusion at L4-5 contributing to severe encroachment of the central canal, and a large disc extrusion at L5-S1 producing severe stenosis and encroachment on the L5 nerve root.  Id.  Dr. Rogoff diagnosed Plaintiff with (1) spinal stenosis with severe degenerative joint disease and referred him to Dr. Phillip Lucas, an orthopedic surgeon, for consideration of surgery, (2) shortness of breath with evidence of myocardial infarction on EKG with severe dyspnea on exertion, (3) high blood pressure, (4) tobacco abuse and (5) seasonal allergies.  (Tr. 127).  No back surgery was ever performed.

On September 23, 2002, Plaintiff returned to Cranston Medical for continued pain in his back radiating into his left leg.  (Tr. 116).

-12-

X-rays of Plaintiff's cervical, lumbar and thoracic spine conducted on October 8, 2002 indicated "[t]here are fairly prominent degenerative changes with disc space narrowing, osteophyte formation, and posterior element sclerosis. This involves essentially the entirety of the L spine. No compression fracture is seen. There is noted to be some pelvic tilt as well with the right iliac crest higher than the left by a few millimeters." (Tr. 142).

Dr. Christopher Caliri, a chiropractor, treated Plaintiff on October 8, 9 and 11, 2002 for severe back spasm, tenderness, decreased range of motion and antalgic gait. (Tr. 140).

On February 4, 2003, Plaintiff underwent a stress echocardiogram that was abnormal with characteristics of reversible ischemia. (Tr. 148). On February 12, 2003, Dr. George McKendall, a cardiologist, examined Plaintiff at Dr. Carnavale's request. (Tr. 147). Based on his examination of Plaintiff and on echocardiogram results, Dr. McKendall opined that Plaintiff should undergo cardiac catheterization for diagnostic purposes. (Tr. 147).

Plaintiff underwent cardiac catheterization and stenting in February 2003. On February 20, 2003, Dr. McKendall wrote to Dr. Carnavale summarizing the results of the surgery and recommending that Plaintiff's back surgery be postponed for six weeks due to the stent implantation. (Tr. 144-146). On March 3, 2003, Dr. Eric Rogoff, Plaintiff's primary care physician, examined him. (Tr. 125). Dr. Rogoff's records indicate that Plaintiff complained of two episodes of chest pain while at rest after catheterization and stenting. Id. Dr. Rogoff referred Plaintiff to Cardiologist Dr. Eric Carnavale for a follow-up regarding his coronary artery disease and ordered pulmonary function tests to address his shortness of breath. Id.

A follow-up echocardiogram performed on March 3, 2003 was normal. (Tr. 132-134, 149). The procedure was terminated after six minutes due to Plaintiff's fatigue. (Tr. 132). However, the exercise failed to induce cardiovascular symptoms or ischemic ECG change which made the presence of significant coronary insufficiency unlikely. (Tr. 132).

Dr. Lucas' May 1, 2003 treatment note states that Plaintiff was "feeling better," although he had "some increasing pain" with activity such as raking around the yard. (Tr. 153). Plaintiff reported feeling "a lot better" for a month or so, with a lot less sciatic pain, although he was still taking a couple of Vicodin daily. Id. Dr. Lucas noted that Plaintiff walked without difficulty. Id. On physical examination, Plaintiff could forward flex with back pain until his hands were within two feet of the floor, he had no sensory or motor deficit, he had symmetrical reflexes and excellent range of motion at the hip and knee, straight leg raising produced back pain but no sign of root tension. Id. Dr. Lucas found no symptoms consistent with a herniated disc at the L5-S1 level, and felt that the disc herniation had resolved. Id. He suggested that Plaintiff take Tylenol ES and "only occasional Vicodin as needed" for his back pain, while continuing his daily stretching program. Id.

Dr. Rogoff's notes for May 12, 2003 state that Plaintiff was "having little in the way of pain" and "generally feels well except for his shortness of breath." (Tr. 123). Dr. Rogoff indicated that the cause of his shortness of breath was unclear. Plaintiff's echocardiogram showed no ventricular dysfunction, and his EKG and pulmonary function tests were normal. Id.

Dr. Carnevale interpreted a May 30, 2003 cardiac ultrasound as being within normal limits. (Tr. 241). He found normal ventricular size and function, no chamber enlargement, and no evidence of pulmonary artery hypertension. Id.

-14-

Dr. Rogoff's October 2, 2003 treatment note indicates that Plaintiff was lifting weights and sanding and lacquering furniture. (Tr. 247). His back felt fine, but "after 1 week of lacquering & sanding," he had developed a sore finger which Dr. Rogoff attributed to an abrasion. Id. With respect to Plaintiff's back pain, Dr. Rogoff "raised questions as to how he can lift weights if he is disabled." Id.

Dr. Stephen Fish, a DDS Consultant, reviewed Plaintiff's file on May 23, 2003 and completed a Physical Residual Functional Capacity Assessment. (Tr. 168-175). Dr. Fish indicated that Plaintiff is able to lift and carry up to ten pounds frequently and twenty pounds occasionally; stand, walk, and/or sit for six hours each out of an eight-hour workday; and push or pull with both upper and lower extremities. (Tr. 169). He further indicated Plaintiff could only occasionally climb, balance, stoop, kneel, crouch or crawl. (Tr. 170).

Dr. Youssef Georgy, a second DDS Consultant, reviewed Plaintiff's file and completed a Physical Residual Functional Capacity Assessment on December 19, 2003. (Tr. 184-191). Dr. Georgy concurred with Dr. Fish's opinion as to Plaintiff's functional physical limitations. (Tr. 185-186).

Dr. J. Stephen Clifford, a DDS Consultant Psychologist, reviewed Plaintiff's medical file on February 14, 2004 and completed a Psychiatric Review Technique Form ("PRTF") (Tr. 205-218) and a Mental Residual Functional Capacity Assessment. (Tr. 221-224). Dr. Clifford assessed an affective disorder, an anxiety-related disorder, and a substance addiction disorder, causing mild restriction of activities of daily living, and moderate difficulties in social functioning and maintaining concentration, persistence and pace. (Tr. 208, 210, 213, 215). Dr. Clifford assessed moderate limitations in understanding, remembering and carrying out detailed instructions; completing a

normal workday/workweek without interruptions and at a consistent pace; interacting appropriately with the general public; and responding appropriately to workplace changes.  (Tr. 221-222).  Dr. Clifford believed Plaintiff should be restricted to "simple tasks of a few steps" based on Dr. John Parsons' observation of impaired memory and poor concentration.  (Tr. 223).  He also believed Plaintiff could work with coworkers but would relate poorly to the public. Id.

On March 4, 2003, Dr. Lucas examined Plaintiff at Dr. Rogoff's request.  (Tr. 154, 157).  Based on his examination of Plaintiff and on MRI results of September 2002, Dr. Lucas opined that Plaintiff appeared to experience a herniated disc, and he recommended conservative treatment including physical therapy and deferred discussion regarding surgical intervention depending on the results of treatment.  (Tr. 154, 157).

Between March 11, 2003 and April 23, 2003, Plaintiff underwent physical therapy at Lepre Physical Therapy.  (Tr. 158-161).  Plaintiff did not show for a scheduled appointment on April 29, 2003 and there are no further visits recorded at that time.  (Tr. 160).

On March 19, 2003, Dr. Caliri, the chiropractor treating Plaintiff for back pain since October, 7, 2002, wrote to DDS summarizing the objective evidence regarding Plaintiff's back problems, indicating that he experienced an antalgic lean and altered gait and numbness.  (Tr. 137-139).  Dr. Caliri's letter also indicates that Plaintiff was prescribed Vicodin, Motrin and Naprosin for his pain. (Tr. 137).

In a letter dated April 28, 2003, Dr. Rogoff opined that Plaintiff's current condition left him completely disabled and that he was being treated by Dr. Lucas in order to determine whether he should undergo back surgery.  (Tr. 124).

As previously noted, on May 1, 2003, Dr. Lucas examined Plaintiff and found him improved. (Tr. 153).  Dr. Lucas opined that he believed Plaintiff's herniated disc resolved and advised him to take Tylenol ES for pain and Vicodin only occasional, as necessary for his continuing pain.  (Tr. 153, 156).

On May 23, 2003, Dr. Rogoff completed questionnaires regarding Plaintiff's condition.  (Tr. 120-122).  Dr. Rogoff opined that Plaintiff was unable to work as a result of severe pain in his lower back and leg due to spinal stenosis at L2-3 and disc bulging at other levels.  (Tr. 120).  Additionally, Dr. Rogoff indicated that Plaintiff's pain medication caused sedation and dependence that had been discussed with Plaintiff.  (Tr. 121). Additionally, Dr. Rogoff opined that Plaintiff was unable to sit, stand or walk at one time for more than one hour in an eight-hour workday, could alternate sitting and standing for only four hours before he needed to lie down and could frequently lift up to ten pounds and occasionally lift up to twenty pounds.  (Tr. 122).

On May 30, 2003 Plaintiff was again treated at Cranston Medical for back pain radiating in his leg and an antalgic gait.  (Tr. 179).  Plaintiff was diagnosed with degenerative disc disease of the lumbar and cervical spine.  (Tr. 179).  Additionally, on May 30, 2003, Plaintiff underwent a cardiac ultrasound which was normal.  (Tr. 241).

On June 11, 2003, Dr. Lucas completed questionnaires regarding Plaintiff.  (Tr. 150-152). Dr. Lucas opined that Plaintiff suffered from resolving left leg sciatica, was taking Vicodin for pain and was unable to work.  (Tr. 150-151).  Additionally, Dr. Lucas opined that, in an eight-hour workday, Plaintiff was able to sit at one time for two hours, stand or walk at one time for one hour, alternate sitting and standing for two hours before he needed to lie down and occasionally lift up to ten pounds.  (Tr. 152).

-17-

On July 8, 2003, Dr. Rogoff treated Plaintiff for continuing complaints of pain, shortness of pain, breath and restless legs. (Tr. 242). Dr. Rogoff encouraged Plaintiff to followup with Drs. Lucas and Carnavale. Id.

Dr. Rogoff examined Plaintiff again on July 23 and 29, 2003. (Tr. 243, 245). Dr. Rogoff's notes indicate that Plaintiff's restless leg syndrome had improved with quinine and prescribed Trazadone for insomnia. (Tr. 245).

Plaintiff underwent physical therapy between September 23, 2003 and December 9, 2003 at Dr. Rogoff's request. (Tr. 246, 249). Physical therapy was conducted as a result of Plaintiff's pain, decreased range of motion and decreased functional ability. (Tr. 246). Plaintiff experienced partial improvement (good days and bad days) with physical therapy and was discharged with an independent home program. (Tr. 249). Dr. Rogoff's treatment note of Plaintiff dated October 2, 2003 indicates that he was lifting weights and sanding and lacquering furniture while in physical therapy treatment. (Tr. 247).

On November 10, 2003, Dr. Rogoff advised Plaintiff to discontinue his lifting and his work on furniture, as it made his back pain worse. (Tr. 248). Additionally, Dr. Rogoff's notes indicate that Plaintiff experienced severe back pain when he did not take narcotic pain medication (Percocet). (Tr. 248). Consequently, Dr. Rogoff continued to prescribe Plaintiff Percocet. Id.

On November 26, 2003, Plaintiff underwent another echiocardiogram which was normal. (Tr. 264-266). In a letter dated December 24, 2003, Dr. Rogoff opined that Plaintiff's spinal stenosis and pain, along with his coronary artery disease, rendered him disabled. (Tr. 250).

On January 7, 2004, Dr. Parsons psychologically evaluated Plaintiff at the request of Plaintiff's attorney. (Tr. 194-204). Plaintiff reported to Dr. Parsons that he had worked as an auto

body shop owner/operator until his automobile accident in December of 2001. (Tr. 196). He explained to Dr. Parsons that he had to close the shop because he was in too much pain and too depressed to continue. Id. Plaintiff also reported to Dr. Parsons a prior history of alcohol and cocaine abuse from which he was sober for ten years but then experienced a relapse with regard to the cocaine two years prior to the evaluation. (Tr. 197). Plaintiff told Dr. Parsons that he was attending dependence treatment at CODAC on a weekly basis. (Tr. 197).

Dr. Parsons noted that Plaintiff's gait was awkward, his posture was rigid and he had difficulty getting comfortable secondary to pain. (Tr. 199). He noted that Plaintiff's facial expression was sad and that he was mildly to moderately distressed and distracted. Id. Based on his interview of Plaintiff, observations of Plaintiff and the results of psychological testing, Dr. Parsons opined that he suffered from major depression (moderate to severe), generalized anxiety disorder, cocaine dependence in early full remission, nicotine dependence and alcohol dependence in sustained full remission with a GAF of 47. (Tr. 200-201).

Based on his evaluation of Plaintiff, Dr. Parsons opined that Plaintiff was moderately-severely impaired in his ability to: (1) understand, carry out, and remember instructions; (2) respond appropriately to supervision; (3) respond appropriately to coworkers; and (4) to perform complex, repetitive or varied tasks. (Tr. 203-204). Additionally, Dr. Parsons opined that Plaintiff was severely limited in his ability to respond to customary work pressures. (Tr. 203).

On January 30, 2004, Dr. Rogoff examined Plaintiff who complained of an episode of chest pain radiating to his back and lasting ten to fifteen minutes and no change in his back pain. (Tr. 251). Dr. Rogoff renewed Plaintiff's medication for insomnia. Id.

On February 14, 2004, Dr. Clifford reviewed Plaintiff's case for the Social Security Administration.  (Tr. 205-224).  Based on Dr. Parsons' January 7, 2004 evaluation (Tr. 233), Dr. Clifford opined that Plaintiff suffered from major depression, generalized anxiety disorder, substance abuse and had no more than moderate limitations in any of the relevant functional categories.  (Tr. 219, 221-222).

On March 1, 2004, Plaintiff underwent an echocardiogram which indicated ischemia in the distal anteroseptal wall of his heart.  (Tr. 267).  On March 15, 2004, Dr. Rogoff noted Plaintiff's continuing complaints of back pain and chest pain and noted his upcoming appointment with Dr. Carnavale to address his positive echocardiogram.  (Tr. 253).

Between April 7, 2004 and April 13, 2004, Dr. Carnavale saw Plaintiff twice and performed a cardiac catheterization.  (Tr. 254, 269, 255, 271).  Based on the results of the cardiac catheterization, Dr. Canavale opined that Plaintiff should continue in medical management of his cardiac problems.  (Tr. 255, 271).

On July 6, 2004, Plaintiff was referred to Dr. Das of the "Pain Clinic" by Dr. Paul Santoro, Plaintiff's new primary care physician, for treatment of his low back pain and to be weaned off Percocet.  (Tr. 256).  Plaintiff was incarcerated around July 9, 2004 for a period of time.  (Tr. 283). On August 26, 2004, Dr. Hafeez Khan, a pain management specialist, examined Plaintiff at Dr. Lucas' request.  (Tr. 229).  Dr. Khan noted Plaintiff's diagnoses as degenerative disc disease, stenosis and subtrochanteric bursitis and injected his left piriformis muscle with a combination of betamethasone and marcaine.  Id.

On October 17, 2004, Dr. Carnavale examined Plaintiff who complained of shortness of breath on occasion. (Tr. 225). Dr. Carnavale noted changes in Plaintiff's pulmonary function tests and ordered a chest x-ray. Id. Results of the x-ray were normal. (Tr. 226).

On November 2, 2004, Dr. Hugo Halo, a psychiatrist, initially evaluated Plaintiff. (Tr. 232-233). Dr. Halo noted that Plaintiff had a history of substance abuse with ten years of sobriety and then relapse, had a recent history of incarcerations for driving without a license and failure to pay fines and was currently on home confinement and complained of insomnia, shakiness and being an "emotional wreck." (Tr. 232). Based on his meeting with Plaintiff, Dr. Halo diagnosed him with severe major depression, a history of drug abuse and a current GAF of 50 (before 70). (Tr. 233). Additionally, Dr. Halo recommended that Plaintiff attend individual counseling, group therapy and participation in Alcoholics Anonymous. Id.

Dr. Halo's treatment notes indicate that he treated Plaintiff on November 8, December 6 and December 13, 2004. (Tr. 234, 240). Additionally, Dr. Carnavale's notes dated October 7, 2004 and Dr. Santoro's notes dated November 2, 2004 note no change in Plaintiff's conditions. (Tr. 258, 259).

Dr. Khan of the Pain Clinic injected Plaintiff's back on November 29 and December 14, 2004. (Tr. 230-231). Dr. Khan's notes indicate temporary improvement with injections but also indicate that Plaintiff continued to experience pain. Id.

On January 12, 2005, Dr. Halo completed questionnaires regarding Plaintiff's psychiatric condition. (Tr. 235-236). Dr. Halo indicated that he had been treating Plaintiff since November 2, 2004 and had diagnosed him with severe major depression and a history of substance abuse. (Tr. 235). Based on his treatment of Plaintiff, Dr. Halo opined that Plaintiff was unable to work and that he was severely impaired in his ability to: (1) understand, carry out and remember instructions; (2)

respond appropriately to supervision; (3) respond appropriately to coworkers; (3) respond to customary work pressures; and (4) to perform complex, repetitive and varied tasks. (Tr. 237-238). Additionally, Dr. Halo opined that Plaintiff was moderately-severely impaired in his ability to perform simple tasks. (Tr. 238).

Plaintiff was incarcerated for approximately one month between May 5, 2005 and June 14, 2005 for driving with a suspended license. (Tr. 279, 284-291). He saw Dr. Gretchen Schueckler, his new primary care physician, on June 30, 2005. (Tr. 279-282). Dr. Schuekler's notes from that date indicate that she referred Plaintiff back to pain management and continued his prescription for Percocet to manage his pain. (Tr. 279-280). Dr. Carnavale's treatment note of Plaintiff dated July 18, 2005 indicates that, in addition to Percocet, Plaintiff was prescribed a variety of medications to address his multiple medical and psychiatric problems. (Tr. 293, 313). Additionally, Dr. Halo's psychiatric treatment notes of Plaintiff indicate that he returned to his office for treatment on July 11, 14 and 18 of 2005. (Tr. 308).

On July 11, 2005, Dr. Parsons psychologically reevaluated Plaintiff at the request of his attorney. (Tr. 297-305). Based on his interview of Plaintiff, observations of Plaintiff and the results of psychological testing, Dr. Parsons opined that Plaintiff suffered from major depression (severe), generalized anxiety disorder, cocaine dependence in full sustained remission, nicotine dependence and alcohol dependence in full sustained remission with a GAF of 45. (Tr. 304-305).

Based on his evaluation of Plaintiff, Dr. Parsons opined that he was moderately-severely impaired in his ability to: (1) understand, carry out, and remember instructions; (2) attend and concentrate in a work setting; (3) respond appropriately to supervision; (4) respond appropriately to coworkers; and (5) to perform repetitive or varied tasks. (Tr. 297-298). Additionally, Dr. Parsons

-22-

opined that Plaintiff was severely limited in his ability to respond to customary work pressures and to perform complex tasks.  Id.

On July 18, 2005, Dr. Carnavale wrote a letter and completed questionnaires regarding Plaintiff's conditions.  (Tr. 294-296, 310-312).  In his letter, Dr. Carnavale states: "Mr. Robert Voccola is a cardiac patient who is limited in exercise tolerance and is physically incapable of gainful employment due to multiple factors...."  (Tr. 294, 312).  In the questionnaire, Dr. Carnavale cites Plaintiff's cardiac condition and low back pain as the basis for his opinion that Plaintiff is unable to work.  (Tr. 295-296, 310-311).

### A.      The ALJ's Decision

The ALJ decided this case adverse to Plaintiff at Step 5.  Although the ALJ determined that Plaintiff had a "severe" back impairment and heart condition, she concluded that Plaintiff's alleged depression did not constitute a medically-determinable impairment.  (Tr. 15).  The ALJ concluded that Plaintiff retained a light-duty RFC with moderate non-exertional limitations in concentration and social functioning.  Based on the vocational expert's testimony, the ALJ held that there were a significant number of jobs in the economy that Plaintiff could perform, and thus he is not entitled to DIB.  Finally, any review of the ALJ's decision must also recognize that it is undisputed that Plaintiff's insured status for DIB expired on December 31, 2003 and thus the issue presented to the ALJ was Plaintiff's disability status on or prior to that date.  (Tr. 14).

### B.      The ALJ Did Not Err in Her Assessment of Plaintiff's Depression

The ALJ determined that Plaintiff's depression was not a medically-determinable impairment.  There was no evidence that Plaintiff sought treatment for depression on or prior to December 31, 2003, the date last insured.  (Tr. 14).  The ALJ also noted that Plaintiff did not begin

treatment with a psychiatrist until November 2, 2004, approximately ten months after his insured status expired.  Id.  See also Ex. 20F.

Under 20 C.F.R. § 1508, a physical or mental "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  In this case, there is a dearth of objective medical evidence that Plaintiff suffered from disabling depression on or prior to December 31, 2003.  Plaintiff never had a psychiatric hospitalization, and his only history of outpatient psychiatric treatment prior to 2004 was for drug and alcohol dependence.  (Tr. 197).  Although there is a pre-2004 record of treatment for insomnia (Tr. 245), there is no medical evidence in the record linking Plaintiff's insomnia to depression or any other documented mental impairment.

Plaintiff relies primarily on the evaluation conducted by Dr. Parsons in January 2004.  Ex. 15F.  Plaintiff was referred to Dr. Parsons by his attorney after the initial denial of his claim for DIB and while his request for reconsideration was pending.  (Tr. 29, 35).  Dr. Parsons' report was considered in ruling on Plaintiff's request for reconsideration (Tr. 36) and by DDS Consultant Dr. J. Stephen Clifford in his February 2004 review.  (Tr. 223; Exs. 16F and 17F).  Dr. Clifford disagreed with Dr. Parsons' conclusions as to the extent of Plaintiff's mental limitations and noted that depression was "not an issue at initial" and that Dr. Parsons' evaluation was "scheduled by atty." (Tr. 219; and Ex. 17F).  Prior to Dr. Parsons' evaluation in early 2004, there was no medical evidence in the record of any treatment for or diagnosis of depression, or even any recommendation that Plaintiff seek a mental health consultation.  Based on this sparse pre-2004 record, the ALJ cannot be faulted for finding a lack of medical support for the existence of a mental impairment during the insured period.

-24-

Despite this deficiency in the record, the ALJ did not completely discount Plaintiff's claimed mental impairment. In fact, the ALJ credited the opinion of Dr. Clifford (Tr. 221-224) who found that Plaintiff had certain moderate psychological limitations. The ALJ gave Plaintiff the benefit of the doubt, as Dr. Clifford's assessment was based both on the evaluation done by Dr. Parsons and Plaintiff's entire medical record up to that point. Based on Dr. Clifford's opinion, the ALJ incorporated non-exertional limitations into Plaintiff's RFC. In particular, the ALJ limited Plaintiff moderately in concentration to "carry[ing] out simple 1-2-3 step tasks" and moderately in social functioning with minimal interaction with coworkers and the public. (Tr. 16, 18 at Finding 6). The ALJ's RFC assessment as to Plaintiff's claimed depression is more than supported by substantial evidence.

Finally, Plaintiff contends that this case should be remanded because the ALJ failed to comply with the "special technique" required under 20 C.F.R. § 404.1520a in assessing the severity of Plaintiff's mental impairments. As Plaintiff correctly notes, in evaluating a claimant's alleged mental impairments, the ALJ is required to follow a "special technique" outlined in 20 C.F.R. § 404.1520a. Pursuant to the technique, the ALJ must determine whether or not Plaintiff's impairments are "severe" by rating the functional limitation which results from the impairment(s) in four specific areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3)-(4), (d). While there is no indication that the ALJ specifically followed the mandatory regulatory review procedure, several courts in this Circuit have found that the failure to explicitly follow the prescribed technique is "harmless error" if the record otherwise supports the ALJ's conclusion, and a remand would not "change, alter or impact the result." See, e.g., Arruda v. Barnhart, 314 F. Supp. 2d 52, 79-81 (D.

Mass. 2004). See also Querido v. Barnhart, 344 F. Supp. 2d 236, 250-254 (D. Mass. 2004). Because of efficiency concerns, this Court sees no benefit in a meaningless remand and agrees with and adopts the standard articulated above, which inquires whether remand would change, alter or impact the result. Further, in Gutierrez v. Apfel, 199 F.3d 1048 (9th Cir. 2000), the Court held that failure to follow a required regulatory review process was essentially harmless error when, as in this case, the record contains no "colorable claim" of mental impairment. Id. at 1051.

While the ALJ did not specifically list a rating for each of the four specified functional areas, she explicitly listed a number of daily activities in which Plaintiff was involved. (Tr. 15-16). The ALJ also stated that Plaintiff was able to visit with relatives, mind the children and socialize; and, based upon the record evidence, Plaintiff could only perform "simple 1-2-3 step tasks." (Tr. 16). While these findings were made with respect to Plaintiff's RFC, they still provide the required ratings for Plaintiff's daily activities, social functioning, and concentration, persistence, or pace. See Querido v. Barnhart, 344 F. Supp. 2d at 251-252; see also Arruda v. Barnhart, 314 F. Supp. 2d at 79 (stating, "[a]lthough discussed in connection with [the claimant's] residual functional capacity, the findings provide the necessary ratings for the functional areas....").

Although the ALJ made no rating with respect to episodes of decompensation, there is no medical opinion in the record that would indicate numerous extended episodes of decompensation. Given this lack of evidence, the ALJ's failure to explicitly discuss this functional area was harmless. See Querido, 344 F. Supp. 2d at 253-254. Moreover, the record contains Dr. Clifford's PRTF evaluation. (Ex. 16F). Dr. Clifford found no marked limitations in any of Plaintiff's functional areas, and noted that Plaintiff had only one or two episodes of decompensation of extended duration. (Tr. 215). See Palmer v. Barnhart, 2004 WL 2862161 at *3 (D. Me. 2004) (finding harmless the

ALJ's failure to follow the prescribed technique for evaluating mental impairments because the record contained two PRTF evaluations that supported the ALJ's non-severity finding).

The ALJ properly assessed Plaintiff's claimed mental impairment and did not err in finding that Plaintiff's depression (pre-2004) was not a medically-determinable impairment. Further, the ALJ's mental RFC assessment is supported by the record.

### C.    The ALJ Properly Applied the Treating Physician Rule

In her decision, the ALJ provides a detailed explanation of the respective weights accorded to the various medical opinions offered regarding Plaintiff. (Tr. 15-16). Although Plaintiff disagrees with the ALJ's ultimate conclusions, he has not shown any error in the ALJ's evaluation of medical evidence. See Rivera-Torres v. Sec'y of Health and Human Servs., 837 F.2d 4, 5 (1st Cir. 1988) (the resolution of evidentiary conflicts is within the province of the ALJ).

Plaintiff alleges that in determining his RFC, the ALJ failed to give appropriate weight to the opinions of Drs. Rogoff (primary care), Lucas (Neurologist) and Carnavale (cardiologist), whom he characterized as his treating physicians. A treating physician is generally able to provide a detailed longitudinal picture of a patient's medical impairments, and an opinion from such a source is entitled to considerable weight if it is well supported by clinical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d). The amount of weight to which such an opinion is entitled depends in part on the length of the treating relationship and the frequency of the examinations. See 20 C.F.R. § 404.1527(d)(1). If a treating source's opinion is not given controlling weight, the opinion must be evaluated using the enumerated factors and "good reasons" provided by the ALJ for the level of weight given. 20 C.F.R. § 1527(d)(2).

-27-

The ALJ provided adequate reasons for her refusal to fully credit the treating source opinions. In addition, her reasons are supported by the record and thus are entitled to deference. For instance, as to Dr. Rogoff (an internist), he based his disability opinion primarily on Plaintiff's back problems, yet the ALJ properly noted that Dr. Rogoff was not an orthopedist, neurologist or back specialist. (Tr. 16). The ALJ also properly compared Dr. Rogoff's opinion with other medical evidence in the record and identified discrepancies. The ALJ accurately noted that Plaintiff had normal examinations and engaged in a full range of activities (id.); and she also relied upon the opinion of Dr. Fish (Ex. 10F) that Plaintiff was fit to perform light-duty work. In addition, the ALJ properly evaluated Dr. Rogoff's opinion in the context of Dr. Kaplan's expert medical testimony. Dr. Kaplan testified, based on his review of the medical records, that Plaintiff could perform light work. The ALJ's RFC assessment is directly supported by the opinions of Drs. Fish and Kaplan. It was the ALJ's province to weigh this medical evidence, and there is no basis in the record for this Court to second-guess her conclusion.

Similarly, the ALJ provided good and supported reasons for her conclusion as to the weight to be accorded to the opinion of Dr. Lucas. (Tr. 16). The ALJ accurately noted that Dr. Lucas only saw Plaintiff twice and that his records (Ex. 7F) reflected relatively normal neurological exams. For instance, on May 1, 2003, Dr. Lucas noted Plaintiff reported "feeling better" and "having a lot less sciatic pain," and opined that Plaintiff's "disc herniation had resolved." (Tr. 153). Finally, Dr. Carnavale, the cardiologist, opined in July 2005 (over one and one-half years after the expiration of Plaintiff's insured status) that Plaintiff was disabled due to moderate low back pain. (Tr. 295). However, Dr. Carnevale was Plaintiff's cardiologist and did not treat his back condition. Further, Dr. Carnavale noted in the July 2005 opinion that Plaintiff's "cardiac status is stable." Id. Plaintiff

underwent cardiac catheterization and stenting in February 2003 and, as accurately noted by the ALJ (Tr. 15), subsequent cardiac testing was normal.  See, e.g., Ex. 24F.  Thus, the ALJ did not err in failing to give controlling weight to the opinions of Drs. Carnavale or Lucas.

### D.     The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff's last argument is that the ALJ did not properly evaluate his credibility and subjective pain complaints.  This argument merits little attention in this case.  Here, the ALJ found that Plaintiff's allegations as to his claimed degree of pain and limitations were "not totally credible." (Tr. 15, 18 at Finding 5).  The ALJ properly supported her adverse credibility determination with references to Plaintiff's range of activities and the medical evidence of record.  (Tr. 15-16); see also 20 C.F.R. § 404.1529.

While Plaintiff may disagree with the ALJ's ultimate conclusion, it was her function to consider and weigh all of the evidence.  It was within the ALJ's province to conclude that the totality of the medical evidence and record evidence as to Plaintiff's condition and activities was more credible than his testimony at the hearing.  See Barrientos v. Sec'y of Health and Human Servs., 820 F.2d 1, 3 (1st Cir. 1987) (evidence of claimant's activities and contrary objective medical evidence was sufficient to support the ALJ's rejection of Plaintiff's complaint of disabling pain).  Finally, the ALJ's credibility determination must be considered in the context of her RFC assessment.  The ALJ did not conclude that Plaintiff could return to his past auto body work classified by the vocational expert as "semi-skilled, heavy" or even to medium exertion work.  The ALJ determined that Plaintiff was limited to light-duty work with additional exertional and non-exertional limitations.  Based on the totality of the record, Plaintiff has shown no error in the ALJ's adverse credibility determination or non-disability finding.

## VI.    CONCLUSION

For the reasons stated above, I order that the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Document No. 8) be GRANTED and that Plaintiff's Motion for Summary Judgment (Document No. 7) be DENIED.   Final judgment shall enter in favor of the Commissioner.


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
January 23, 2007